## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ralph Mervine,

               Plaintiff,                     **MEMORANDUM OPINION**
                                         **AND ORDER**

v.                                       Civil No. 14-3080 ADM/TNL

Plant Engineering Services, LLC,

               Defendant.

_____

Karin Ciano, Esq., Karin Ciano Law PLLC, Minneapolis, MN; Clayton D. Halunen, Esq., and Ross D. Stadheim, Esq., Halunen Law, Minneapolis, MN, on behalf of Plaintiff.

Joseph D. Weiner, Esq., and Kerry L. Middleton, Esq., Littler Mendelson, PC, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On January 19, 2016, the undersigned United States District Judge heard oral argument on Defendant Plant Engineering Services, LLC's ("PES") Motion for Summary Judgment [Docket No. 26].  Plaintiff Ralph Mervine's ("Mervine") Complaint [Docket No. 1-1] asserts a single cause of action for an alleged violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932.  For the reasons set forth below, PES' Motion is granted.

## II.  BACKGROUND

PES provides multi-disciplined engineering, project management services, and start-up support services to clients throughout the country.  Kreuiter Decl. [Docket No. 30] ¶ 2.  PES is a subcontractor to Fluor, Inc. ("Fluor"), which agreed to provide engineering services to Flint Hills Resources ("Flint Hills").  Pl's. Index Exs. [Docket No. 38] ("Dep. Trs.") Attach. 5 ("Hicks Dep.") 7:19–23.  PES has provided engineering services under this agreement to Flint Hills' Pine Bend refinery in Rosemount, Minnesota, since 2008.  Id. 9:17–10:2.

**A.  The Flint Hills Resources Contract**

Under the contract, PES determined the base compensation of its employees.  The contract further provided for a preapproved mark-up that PES would bill Flint Hills for each hour a PES employee worked.  Dep. Trs. Attach. 4 ("Kern Dep.") 49:4–9.  If, for example, the employee's base compensation was $20 an hour and the preapproved markup was 60%, then PES would bill Flint Hills $32 an hour for that employee.

PES evaluated its employees' salaries on an annual basis both to ensure that their compensation was competitive and to determine if a salary increase was merited.  Dep. Trs. Attach. 8 ("Picou Dep.") 79:21–25.  If PES decided to raise employees' salaries, it negotiated with Flint Hills for an increase in the bill rate to account for the salary increase.  Id. 80:1–9.  If Flint Hills did not agree to the increase, then PES would pay for the salaries through a decrease in its margins.  Dep. Trs. Attach. 3 ("Robinson Dep.") 52:21–25.  If Flint Hills approved the salary increase, PES was able to distribute the additional revenue among its employees as it might choose.  Id. 53:12–16.  For example, if the total bill rate was $5 million and Flint Hills approved a 2% increase, PES could allocate the $100,000 (2% of $5 million) between its employees in its own discretion.

**B.  Ralph Mervine and the Flint Hills Facility**

Mervine, a professional engineer with over 25 years' experience working on engineering projects, began working for PES in May 2012.  Dep. Trs. Attach. 1 ("Mervine Dep.") 91:1–7.  Mervine first worked as a project manager at an Alcoa plant in New York.  Id. 91:1–20.  While in New York, Mervine expressed interest in a site manager position that was expected to become available at the Flint Hills facility in Rosemount.  Id. 120:4–9.

In January 2013, to pursue the opportunity in Minnesota, Mervine met with his PES supervisor, Chris Henry, and with Bill Hicks, the PES employee who managed the Flint Hills contract.  Id. 121:2–12; Hicks Dep. 8:15–19.  The Minnesota facility was described to Mervine as a "powder keg."  Mervine Dep. 122:21.  The increased expectations and obligations of Flint Hills was increasing stress and hurting the morale of PES employees.  Flint Hills was unsatisfied with the services the PES employees were providing.  Id. 123:1–13; Hicks Dep. 16:19–17:17.

**C.  Mervine's Employment at Flint Hills**

In April 2013, Mervine accepted the site manager position in Minnesota.  Mervine Dep: 118:9–12.  Mervine, the seventh site manager at the Flint Hills facility in the prior fifteen years, was immediately responsible for supervising over 62 employees managing around 225 projects per year.  Id. 123:22–24; Ciano Decl. [Docket No. 34] Ex. 11; Mervine Dep. 136:6–8.  At the time Mervine started, 48 of the projects were more than two weeks behind schedule.  Picou Dep. 76:5–9.

Mervine's initial supervisors in Rosemount were Henry and Hicks.  Id. 9:11–15; Mervine Dep. 136:14–22.  Sometime shortly after Mervine's employment began, Henry left PES.  Picou Dep. 11:18–25.  Joe Picou assumed Henry's role as PES' director of plant operations and as Mervine's administrative supervisor.  Id.

 Mervine understood his initial assignment was to keep Hicks happy.  Mervine Dep. 141:15–16.  Mervine's first few months as site manager were successful; PES and Flint Hills were each satisfied with Mervine's performance.  Id. 146:6–15; 157:13–17.

### 1. Shaina Botka

The first documented issue concerning Mervine's PES employment appeared in late 2013.  During a November 2013 client meeting, Shaina Botka, a PES project manager who reported directly to Mervine, "blew up" over Flint Hills' changes to the project schedule Botka proposed.  Id. 162:5–14.  Mervine's attempt to defuse the situation by clarifying to Botka that Flint Hills was only proposing to adjust the schedule of one project, rather than many as Botka believed, was unsuccessful.  Id. 167:7–168:4.  Mervine viewed Botka's frustration as being directed at both the client and Mervine for not standing up for PES.  Id. 168:5–10.  After that incident, Mervine's relationship with Botka deteriorated and conversation with her became confrontational.  Id. 168:11–17.  Botka was openly hostile towards staffing changes Mervine proposed and threatened to quit if certain PES employees began working at the Flint Hills facility.  Id. 169:4–11.

After a December 2013 meeting, Mervine received an email from Botka.  Kreuiter Decl. [Docket No. 30] Ex. A.  In the December 13 email, Botka claims Mervine told her and another employee that Mervine needed to "clean house" and that he could fire both employees.  Id. Mervine forwarded Botka's email to Jason Kreuiter, a PES human resources manager, that same day.  Id.; Dep. Trs. Attach. 6 ("Kreuiter Dep.") 7:3–5.  Mervine requested a chance to speak with Kreuiter about Botka and her concerns about Mervine's plans to improve the work PES was doing at the Flint Hills facility.  Kreuiter Decl. Ex. A.  This was the first time Kreuiter received any negative feedback about Mervine's performance.  Kreuiter Dep. 8:7–17.  Botka also emailed Kreuiter directly on December 13.  Kreuiter Decl. Ex. B.  In a December 18 follow up email, Botka questioned Mervine's professionalism and feared that her job may be at risk due to

personal grievances with Mervine.  Id.

Despite the tension with Botka, Mervine's December 2013 performance review was positive and Flint Hills remained satisfied with Mervine's job performance.  Ciano Decl. Ex. 2; Kern Dep. 24:19–25.  In January 2014, Mervine received a raise and a promotion.  Ciano Decl. Ex. 3.  Nevertheless, Mervine's relationship with Botka remained strained.  In a January 23, 2014 email Mervine wrote to Kreuiter, Mervine stated that Botka had completely stopped communicating with him.  Id. Ex. 8.

### 2.  January 28, 2014 Conference Call

In December 2013, PES started planning for its annual rate negotiation with Flint Hills. Kreuiter Decl. ¶ 7.  PES decided to seek reimbursement for past wage increases that Flint Hills had not covered.  PES also discussed seeking reimbursements for quarterly bonuses PES had been paying some employees since 2009.[1]  Hicks Dep. 88:24–89:13.  PES had not previously sought reimbursement from Flint Hills for the quarterly bonuses.  Id. 89:12–13.

Mervine was assigned to figure out how PES could capture the quarterly bonuses.  In an email, Mervine wrote that he was "not aware of a way to pass the Quarterly bonus to Flint Hills reinbursable [sic] by increasing employee salary."  Ciano Decl. Ex. 3.  In that same email Mervine stated that Hicks and Cathy Robinson, a project control specialist who worked in financial services, agreed.  Id.

On January 28, 2014, Mervine, Hicks, Picou, Kreuiter, and Michael Sullivan, a PES

---

[1] Prior to 2009, PES' employees at the Flint Hills facility had been employed by Fluor. In a 2009 cost cutting measure, Fluor transferred all of its employees to PES, which offered reduced benefits.  Dep. Trs. Attach. 3 ("Robinson Dep.") 32:21–33:7.  To compensate for some of the difference, PES paid these employees a quarterly bonus.  Id.

employee from financial services, had a conference call to discuss asking Flint Hills for a rate increase to cover the quarterly bonuses.  Id. Ex. 18.  During the call, Picou instructed Mervine to approach Flint Hills for additional funds that would cover the quarterly bonuses.  Mervine Dep. 258:2–7. According to Mervine, Picou also directed him to conceal from Flint Hills the purpose of the increase.  Id. 260:6–25.  Mervine responded to the request by telling Picou that such a request was illegal.  Id. 262:2–5.  Mervine believed that since Fluor was already collecting money from Flint Hills for the quarterly bonuses, Picou's request would constitute billing Flint Hills twice for the same expense.  Id. 263:7–14.  Picou responded by saying that he did not appreciate being told he was doing something unethical or illegal.  Id. 266:10–12.  The conference call was abruptly terminated after this exchange.  Id. 265:25–266:5.

Picou took offense to Mervine's comments, later describing his response as an "outburst."  Picou Dep. 91:24–25.  A few days after the conference call, Hicks arrived for the company holiday party and Mervine drove him from the airport.  Mervine Dep. 283:12–17. Hicks knew that Picou was upset at Mervine for what transpired on the conference call, telling Mervine that "it will be a long time before [Picou] gets over that one."  Id. 286:5–6.  According to Mervine, Hicks stated that Mervine had done the right thing on the conference call.  Id. 283:2–15.  While Hicks agreed telling Mervine that he was correct to raise the issue, Hicks stated that he felt this way not because Mervine was correct about his interpretation of the billing issue, but rather because Mervine seemed concerned about raising issues to Picou at times. Hicks Dep. 93:10–24.

On or about February 3, 2014, Mervine met with Robinson and told her what happened. Mervine told Robinson that he "was in the doghouse with [Picou]."  Robinson Dep. 34:9–12.

Mervine claims Robinson agreed that what Picou was asking him to do was illegal.  Mervine

Dep. 296:7–10.  That same day, Picou phoned Mervine to apologize.  Picou Dep. 91:22–24.

After apologizing for his reaction, Picou reiterated that he did not appreciate having his ethics

challenged, telling Mervine that he did not correctly understand what he was being requested to

do and that the two of them should get together to clarify how the Flint Hills billing and

financials worked.  Id. 91:22–92:12.

### 3. Additional Employee Complaints

During the morning of January 28, 2014, the same day as the conference call, PES Senior

Project Engineer Rick Panzer emailed Kreuiter and requested a chance to talk about "a

situation."  Kreuiter Decl. Ex. D.  The following morning, Kreuiter emailed Panzer, thanked him

for passing along his concerns, and told him that a "dialogue with management" had been

opened.  Id.  Kreuiter asked Panzer to summarize his concerns about Mervine's behavior.  Id.  In

an email sent that evening, Panzer stated that although things had recently gotten better,

Mervine's lack of professionalism and knowledge of the job was problematic.  Id.  Panzer

described two specific incidents where he questioned Mervine's professionalism.  Id.  Panzer

also wrote that Mervine was dozing off in meetings, making comments that had employees

concerned about their long term job security, discussing private matters among others, and more

concerns.  Id.

On January 29, 2014, Kreuiter received an email from Botka.  Weiner Decl. [Docket No.

29] Ex. 2 at Ex. 8.  Botka wrote that she was nervous about her job and that she was struggling to

stay full time because she had not been getting new work.  Id.  Kreuiter responded to Botka's

email and requested, as he did with Panzer, that Botka summarize her concerns.  Id.  On

February 3, 2014, Botka wrote an email to Kreuiter that listed her grievances with Mervine.  Id.

Ex. F.  Like Panzer, Botka complained that Mervine slept and asked counterproductive questions

in client meetings.  Id.  Botka reiterated her concern about her job security and described some

specific situations questioning Mervine's behavior.  Id.  Botka closed her email by stating that

the situation "has reached far beyond acceptable professional behavior, and will potentially

jeopardize this contract, and many people's jobs, including my own."  Id.

On January 30, 2014, before Kreuiter received Botka's detailed email, Kreuiter

forwarded Panzer's email to Hicks and Picou.  Kreuiter Decl. Ex. E.  While Kreuiter did not

share the identity of the email sender, Kreuiter related "[t]he person that sent this note is a long

time Pine Bend employee who I feel confident that he'd have no reason to make any of this up."

Id.  Hicks responded by asking if Kreuiter had considered on-site employee interviews to follow

up on Panzer's concerns.  Id.  Kreuiter replied that he had considered it and that he would

discuss that idea with Picou.  Id.  Kreuiter, in consultation with his boss, decided to travel to

Minnesota to speak with a large portion of the site team on an individual basis.  Kreuiter Dep.

41:24–25:12.

On February 4, 2014, the day after receiving Botka's email specifically describing what

she called unprofessional conduct by Mervine, Kreuiter received an email from Charles

Sandiford, a PES Piping Designer.  Kreuiter Decl. Ex. G.  Sandiford described an encounter he

had with Mervine in the parking lot as he was leaving work on February 3.  Id.  Sandiford

explained that Mervine questioned his choice to socialize with his wife and other co-workers

rather than attend the company party.  Id.  Sandiford characterized Mervine's questions as more

than innocent probing and stated that he felt uncomfortable and that Mervine's behavior was

disrespectful.  Id.

Later that same day, Kreuiter received an email from David Mannello, a Piping and Mechanical Design Supervisor with PES.  Id. Ex. H.  Mannello wrote that Sandiford came into his office first thing in the morning to vent about his encounter with Mervine in the parking lot the night before.  Mannello stated that his conversation with Sandiford was not unique; other PES employees frequently divulged their frustrations about Mervine to him.  Id.  Mannello additionally stated that he can attest to the veracity of other employee complaints regarding Mervine, and that in more than 28 years of work experience, he had never been "subjected to the nonsense that is going on here on a daily basis."  Id.  Mannello expressed an interest in speaking with Kreuiter when he arrived on site.  Id.

On February 12, 2014, Kreuiter received an email from PES mechanical engineering lead Robert Dunlop.  Kreuiter Decl. Ex. I.  Dunlop complained about being the "front man" for emotional issues that Mervine will not handle himself.  Id.  The next day, Dunlop blind copied Kreuiter on an email addressed to Mervine.  Id. Ex. J.  In that email, Dunlop said he felt undermined by Mervine's decision to ignore a proposal that Dunlop prepared at Mervine's request.  Id.

**D.  Investigation**

Kreuiter was dispatched to the Flint Hills site to investigate the merits of the employee complaints.  Prior to Kreuiter's departure, Picou sent Hicks an email stating that "[d]ue to the nature of some of the issues, we may not be able to take corrective action through coaching, mentoring, or disciplinary actions."  Ciano Decl. Ex. 15.  Picou further stated that they should start "considering the worst case scenario," meaning "a change in site leadership," and that they

should "start thinking of potential candidates."  Id.

### 1.  Mervine's Suspension

On Friday, February 14, 2014, before Kreuiter arrived at the Flint Hills site, Don Kern, Flint Hills' Engineering and Facilities Manager, was anonymously telephoned and told to Google Mervine's name.  Kern Dep. 35:21–23.  Kern did so and discovered reports of Mervine being connected with pornography.  Id. 36:25–37:5.  Kern passed this information along to Hicks, who stated that he was looking into it and that an investigation into Mervine was already taking place.  Id. 37:12–18.

In his deposition, Hicks stated that Flint Hills decided to ban Mervine from its Rosemount facility after learning about the purported pornography connection.  Hicks Dep. 58:4–10.  Kern denied it was Flint Hills who prevented Mervine from accessing the job site, claiming that since Mervine was an employee of PES, it was up to PES to determine how to handle it.  Kern Dep. 33:16–20; 37:23–28:3.  Mervine testified that Kreuiter told him that he was not permitted at the Flint Hills site the following Monday and Tuesday, February 17 and 18. Mervine Dep. 338:20–24.  Mervine understood his suspension was related to Kreuiter's interviews and that Mervine was not to be on site while the interviews occurred.  Id. 339:10–14.

### 2.  Employee Interviews

Kreuiter traveled to Minnesota and began his site interviews on February 17, 2014. Kreuiter Dep. 49:22–25.  Kreuiter spoke with managers, supervisors, and other employees who had expressed concerns about the site.  Id. 42:14–19.  In total, Kreuiter interviewed 22 PES employees.  Ciano Decl. Ex. 9.  The interviews were approximately 30 to 45 minutes in length and the interviewees "were of the understanding that [human resources] was there to discuss

'how things are going.'"  Id.

Kreuiter summarized the interviews in a report, and takeaway points from each interview were noted.  Id.; Kreuiter Dep. 49:5–50:4.  While some employees approved of Mervine, the majority of interviewed employees reported concerns about him.  Ciano Decl. Ex. 9.  Multiple employees reported that Mervine had fallen asleep during client meetings and had threatened people's jobs.  Id.  A number of employees said that moral was low and that they lacked confidence in Mervine's abilities.  Id.

Shortly after concluding the interviews, Kreuiter give Mervine an opportunity to discuss some of the allegations that were raised against him.  Kreuiter Dep. 86:22–87:5.  Mervine denied most the allegations Kreuiter mentioned.  Ciano Decl. Ex. 10.  Mervine denied expressing a desire to fire Botka or making any threat to her job.  Id.  Mervine denied Dunlop's allegation that Mervine said he was "going to get that bitch for complaining to HR" or that he would like Botka "to go away."  Id.  Mervine also denied sleeping during meetings.  Mervine Dep. 210:21–212:2.

Despite Mervine's denials, Kreuiter determined that it was reasonable to conclude that the unprofessional conduct raised during the employee interviews likely had occurred.  Kreuiter Dep. 90:14–22.  Kreuiter credited the employees over Mervine because

> multiple individuals made the same types of complaints about Mr. Mervine, and Mr. Mervine's blanket denials conflicted with the information provided by numerous individuals.  For example, multiple employees identified instances where Mr. Mervine threatened to fire an employee, and Mr. Mervine simply denied this occurred.  I did not think that all of these employees would make up these allegations and credited their version over Mervine.  That was true regarding the other allegations as well.

Kreuited Decl. ¶ 16.  Kreuiter advised Picou of his findings.  Kreuiter Dep. 84:12–23.

## E. Termination

The employee interviews, coupled with prior complaints about Mervine, led PES management to conclude that Mervine was "no longer fit to remain as site manager due to unsatisfactory job performance as site manager."  Ciano Decl. Ex. 16.  In justifying this decision, PES cited Mervine's "retaliatory activities, hostile work environment and degradation of leadership ability.  Additionally, general professional behavior was lacking due to profanity, falling asleep in meetings and inappropriate sharing of information."  Id. Ex. 9.

On February 20, 2014, Mervine's employment with PES was terminated.  Picou, in consultation with the human resources personnel, made the decision to end Mervine's employment.  Picou Dep. 131:18–23.  The reason for termination was the complaints identified in Kreuiter's investigation.  Id. 134:13–20.

Mervine's lawsuit contends that his termination was retaliatory, and that the true motivation was his telling Picou on the January 28, 2014 conference call that what Picou wanted him to do was illegal.

## III.  DISCUSSION

## A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992), (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

## B.  The Minnesota Whistleblower Standard

The Minnesota Whistleblower Act ("MWA") prohibits an employer from retaliating against an employee who, "in good faith," "reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an

employer. . . ."  Minn. Stat. § 181.932 subd. 1(1).  Mervine has no direct evidence of retaliation, thus he argues that the viability of his MWA claim uses the burden shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  First, the burden is on Mervine to prove a prima facie case of retaliation.  <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).  Next, the burden moves to PES to articulate a non-retaliatory justification for the adverse employment action.  <u>Id.</u>  Finally, the burden returns to Mervine to prove that the proffered non-retaliatory reason is untrue and is a pretext for retaliation.  <u>Id.</u>  To establish a prima facie case, Mervine must prove 1) protected activity, 2) an adverse employment action, and 3) a causal connection between the two.  <u>Id.</u>

PES argues that Mervine has failed to meet his initial burden to prove a prima facie MWA case of protected activity and causation.  PES also argues that, even if Mervine met his initial prima facie burden, summary judgment is warranted because Mervine failed to show that PES' stated decision to terminate Mervine's employment was pretextual.  Because summary judgment will be granted on the lack of evidence of causal connection and pretext, protected activity will not be discussed here.

### 1. Causal Connection

PES argues that Mervine cannot establish a triable issue of fact on the causal connection between his purported protected activity and his termination.  Mervine must prove that his termination was causally connected to the January 28, 2014 conference call during which he told Picou that trying to collect the quarterly bonuses from Flint Hills was illegal.

PES argues that Mervine relies merely on the temporal proximity between the two events as evidence of a causal connection.  PES concludes that the amount of time between the January

28, 2014 conference call and his February 20, 2014 termination—approximately three weeks—is insufficient to satisfy this element.  Although, Mervine, in response, does not dispute PES' depiction of the proximity between the two critical events, he does dispute PES' conclusion that a three week lag between the two acts is insufficient to establish this element.  He contends that the duration between the conference call and his termination supports an inference of causation precluding summary judgment on this issue.

"Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc).  However, "we have sometimes held that the timing of one incident of adverse employment action following protected activity sufficed to establish causal connection." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002).  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

As PES correctly observes, no bright line has been established for when the connection between the protected activity and adverse action becomes too attenuated to support the causation requirement.  The Eighth Circuit has stated that "[t]he timing of an adverse employment action in connection with the protected activity 'can sometime establish causation for purpose of establishing a prima facie case.'" Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 915 (8th Cir. 2006) (quoting Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000)).  For example, in Smith, two weeks lapsed between protected activity and the adverse

15

employment action.  Smith, 302 F.3d at 833.  Buttressed by the fundamental philosophy in

McDonnell Douglas that an employee must present only a "minimal showing" before an

explanation from the employer is required, the Eighth Circuit held that the two weeks was

"sufficient, but barely so, to establish causation."  Id.  In a different case, a gap of "a matter of

weeks" met the "bare minimum required to support the [causation element]."  Sprenger v. Fed.

Home Loan Bank of Des Moines, 253 F.3d 1106, 1113 (8th Cir. 2001).

        The caselaw also recognizes that intervening unprotected conduct can erode the causal

connection between the two key events.  Kiel, 169 F.3d at 1136.  For instance, the plaintiff in

one case was investigated and disciplined for conduct that occurred prior to any protected

activity.  Scroggins v. Univ. of Minn., 221 F.3d 1042, 1043–44 (8th Cir. 2000).  Shortly after

being disciplined, the employer learned that the plaintiff filed a complaint with the Equal

Employment Opportunity Commission.  Id. at 1044.  Nearly two weeks after filing the

complaint, the plaintiff was again cited for misconduct and terminated as a result.  Id.  In

upholding the legality of the termination and dismissing plaintiff's retaliation claim, the Eighth

Circuit stated that the plaintiff's "intervening unprotected conduct eroded any causal connection

that was suggested by the temporal proximity of his protected conduct and his termination."  Id.

at 1045 (quotation marks omitted).

        PES advocates for a similar result here, arguing that the motivation for investigating

Mervine materialized prior to any protected activity and was supplemented by further allegations

of misconduct made after the January 28, 2014 conference call.  Mervine, in response, disagrees

that the inference of causation is impaired by intervening events.  Mervine argues that although

PES received knowledge of employee complaints about Mervine as early as June 2013, it did

nothing until after the conference call, suggesting that the investigation was motivated by his statements during the conference call.  Mervine additionally argues that employee complaints at the Flint Hills facility were common, pointing out that Botka's December 2013 complaint about Mervine to human resources did not spur PES to investigate further.  It was not until after the conference call, Mervine continues, that PES decided to undertake its formal investigation, indicating that the true motivation for the investigation and subsequent termination was Mervine challenging Picou on the conference call.

Mervine's argument suffers from two defects.  First, even if Mervine's depiction of the events is credited and Kreuiter was not aware of Panzer's concerns about Mervine until after the conference call, it was Hicks, not Picou, who directed Kreuiter to begin his investigation.[2]  This is significant because it distinguishes what occurred here from the authority Mervine relies upon.  See Turner v. Gonzales, 421 F.3d 688 (8th Cir. 2005) (noting that five days after plaintiff's supervisor learned about accusations of gender discrimination, that same supervisor generated an unscheduled performance review and downgraded plaintiff's regularly scheduled review that occurred less than two months prior).  Indeed, contrary to Mervine's assertion, there is scant evidence in the record to suggest that Kreuiter's investigation was motivated by Picou, the individual who was most connected to Mervine's purported protected activity and the individual who ultimately decided to terminate Mervine's employment.

---

[2] As support for his argument that the investigation was truly stoked by the conference call, Mervine also emphasizes that, despite Botka's complaints, he was given a favorable performance review on December 13, 2013 and a raise and promotion in January 2014.  The strength of this argument is diminished, however, because the person who positively rated Mervine and approved the promotion and raise, Picou, was unaware of Botka's complaints.  The record reflects that Botka and Mervine discussed their concerns with Kreuiter, but there is no support in the record that either Botka, Mervine, or Kreuiter raised these issues with Picou.

Second, and more importantly, PES received at least four complaints from employees after the conference call, with three of the complaints citing encounters with Mervine that occurred after January 28, 2014:  1) Botka's February 3 email referencing specific issues with Mervine, noting that he had crossed a professional boundary; 2) Sandiford's February 4 email expressing his feelings of disrespect by Mervine's inquiries into him not attending the company holiday party; 3) Mannello's February 4 email attesting to Sandiford's frustration and further stating that he has never been subjected to the nonsense that was going on at the Flint Hills facility on a daily basis; and 4) Dunlop's frustrations about work assignments and being used as a front person to resolve issues Mervine himself did not want to handle.[3]  While not as severe, these reports have the same legal import as the intervening misconduct in <u>Freeman v. Ace Telephone Ass'n</u>, which also occurred after protected activity.  467 F.3d 695, 697 (8th Cir. 2006).

Mervine attempts to distinguish <u>Freeman</u> and other cases like it by arguing an implicit requirement that the intervening misconduct be undisputed.  While Mervine cites cases where the plaintiff admitted to the intervening conduct, the Eighth Circuit has never expressly stated that disputed intervening conduct will not suffice to break the causal chain.  In fact, the Circuit has concluded the opposite, that disputed intervening conduct can erode the causal connection. In <u>Scroggins</u>, for example, the plaintiff was accused of taking an unauthorized break after engaging in protected activity.  221 F.3d at 1045.  This was cited as the intervening unprotected conduct that eroded the causal connection despite "Scroggins' belief that he was still on break

_____

[3] Panzer's complaint is omitted from this list because his email requesting to talk with Kreuiter about issues with Mervine was received by Kreuiter prior to the January 28, 2104 conference call.

when [his boss] confronted him." Id.  Another example is Kiel, where the plaintiff was accused

of shouting at his supervisor in front of other employees.  169 F.3d at 1134.  As in Scroggins,

this behavior was what "eroded any causal connection" despite the plaintiff's position "that he

was not aware that he had raised his voice." Id. at 1134, 1136.  Mervine's argument that because

the intervening conduct is disputed it cannot break the causal chain is not the law in the Eighth

Circuit.

The record also includes PES employee complaints about Mervine stemming from

incidents that took place after the purported protected activity.  In addition, the 22 interviews that

occurred after the call both corroborated the earlier complaints and raised new areas of concern

about Mervine's professionalism.  This is not a case where one minor incident is situated

between the bookends of protected activity and termination.  Rather, this is a case where

multiple accusations of misconduct were later repeated by, and expanded upon, by nearly two

dozen employees.  This is sufficient to conclude, as a matter of law, that Mervine has not met his

prima facie burden as to the causal connection between the protected activity and termination.

**2. Pretext**

Mervine's MWA claim also fails because he has not presented sufficient evidence for a

reasonable fact finder to conclude that PES' stated justification for terminating his employment

was a pretext for illegal retaliation.  Mervine raises three arguments in an effort to avoid this

conclusion.  First, Mervine argues that his favorable performance review in December 2013

followed closely by his February 20, 2014 termination for poor performance suggests that the

true justification for his termination was his protected activity, not, as PES claims, the

misconduct complained of by other employees.  Second, Mervine contends that PES failed to

follow its own procedures, particularly in comparison to how PES managed and coached Mervine's predecessor, Rich Salisbury, through accusations of poor performance. Finally, Mervine argues that the person who decided to terminate his employment, Picou, and the person whose interviews informed that decision, Kreuiter, were unable to recall the specifics of the employee complaints, belying PES' proffered justification.

"Proof of pretext requires more substantial evidence than a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext . . . [and retaliation] is viewed in light of the employer's justification." Gibson v. Geithner, 776 F.3d 536, 540 (8th Cir. 2015) (alterations in original) (internal quotation marks omitted). Mervine may create a material question of fact on the issue of pretext in two ways. First, Mervine may indirectly show that PES' proffered explanation has no basis in fact. Id. Second, Mervine can directly show that "a prohibited reason more likely motivated the employer." Id.

Picou's December 2013 positive review of Mervine's performance is an insufficient indicia of pretext because, as mentioned above, Picou had no knowledge of the employee complaints at the time he reviewed Mervine's performance. There is nothing in the record to support that Picou's favorable review was rendered with awareness of the allegations of fellow PES employees about Mervine, making Mervine's citation to O'Bryan v. KTIV Television, 64 F.3d 1188 (8th Cir. 1995), inapposite. In that case, the plaintiff, a salesperson, was terminated for poor performance despite introducing documentary evidence which tended to show that his sales figures were stronger than his colleagues. Id. at 1191–92. Here, what Picou did know when he reviewed Mervine's performance was that the number of behind-schedule projects had decreased and Flint Hills had expressed an interest in PES taking on larger projects. Unlike the complaints, of which Picou was unaware, these marks of success were considered in Picou's

decision to rate Mervine favorably.[4]  Also notable is that, unlike in O'Bryan, PES' stated

justification for Mervine's termination was not contradicted by documentary evidence.  While

the record does reflect that Mervine was successful in certain aspects of his job, the record also

includes a significant volume of evidence that he was deficient in others.  It was these

deficiencies that PES cited as justifying Mervine's termination.[5]

     As to Mervine's second argument, that he was treated differently than Salisbury, it too

lacks force.  While Salisbury was given coaching in an effort to enable him to meet Flint Hills'

expectations, the issues that marked Salisbury are very divergent from Mervine's issues.  See

Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (noting that disparity in

discipline was "clearly warranted" for more severe incident).  Mervine was accused of creating a

hostile work environment, which was documented and corroborated by the 22 interviews

Kreuiter completed.  Salisbury, according to Mervine, was provided coaching to respond to the

client's concerns about his work performance.  There is nothing in the record that Salisbury was

---

[4] Mervine also argues as evidence of pretext that Flint Hills never lodged any complaints about Mervine sleeping during meetings, ostensibly challenging the veracity of the employee complaints against Mervine.  The critical inquiry, however, "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge."  McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861–62 (8th Cir. 2009).  On this record, no reasonable fact finder could conclude that PES lacked a good faith belief that Mervine engaged in misconduct.

[5] Mervine also asserts as evidence of pretext that PES' stated reasons for his termination shifted.  Mervine cites an email Picou sent to Hicks that purports to show that Mervine was terminated for poor performance rather than for creating a hostile work environment, the reason Picou gave to Mervine when Picou explained the termination decision.  That email, which states "I just terminated Ralph Mervine based on unsatisfactory job performance as site manager based on information discovered during our investigation this week," does not demonstrate a change in justification.  Ciano Decl. Ex. 16.

accused of misconduct such as sleeping during client meetings, threatening other employee's

jobs, or any of the other specific instances discovered in the course of the interviews Kreuiter

conducted.  While the standard for determining whether employees are similarly situated does

not require perfect symmetry, Mervine is required to present evidence that another employee, in

this case Salisbury, was treated differently for violations that are of "comparable seriousness."

Burton v. Ak. Sec. of State, 737 F.3d 1219, 1230–01 (8th Cir. 2013).  Mervine has not met this

burden.

      Finally, Mervine's argument questioning the specifics of the employee complaints also

does not defeat summary judgment.  While Mervine stresses that Flint Hills never complained

about Mervine sleeping in meetings—ostensibly to discredit the complaining employees'

allegations—Mervine seemingly ignores the other accusations that were levied against him by

multiple employees that were independently corroborated by Kreuiter's investigation.[6]  It is also

of little consequence that profanity was common behavior at the Flint Hills facility because PES

never claims it terminated Mervine for using foul language.  As Mervine recognizes, the

question is not whether the stated basis for termination was fair or even whether it actually

occurred, "but whether the defendant believed it to have occurred."  Miller v. Stifel, Nicolaus &

---

[6] Mervine avers that Kreuiter encouraged complaints from employees who had never complained about Mervine before, insinuating that Kreuiter's questions were posed in a manner to create negative sentiment towards Mervine.  This averment lacks record support.  For example, Wael Hannah, a PES engineer testified in his deposition that his meeting with Kreuiter "was about more than just one person; it was about the offices, the direction of where we're going with the office."  Hannah Dep. 16:14–16.  Brian Daly, another PES employee that Kreuiter interviewed, agreed, stating that the questions were "general, you know, what was your thoughts on Ralph."  Dep. Trs. Attach. 2 31:1–2.

Co. 812 F. Supp. 2d 975, 991–92 (D. Minn. 2011).  On this record, no reasonable fact finder could conclude that PES' proffered reason is either "unworthy of credence . . . because it has no basis in fact" or that Mervine's engagement in protected activity "more likely motivated the employer."  Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011).  Summary judgment is granted.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment [Docket No. 26] is **GRANTED**; and

2.     All claims in the Complaint [Docket No. 1-1] are **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 31, 2016.

23